**IN RE: Willie L. SHORTER, Debtor.**

**Case No. 4:10–bk–14935J/B**

United States Bankruptcy Court,
E.D. Arkansas,
Little Rock Division.

Signed October 23, 2015

Clarence W. Cash, Attorney at Law, North Little Rock, AR, for Debtor.

## ORDER

Phyllis M. Jones, United States
Bankruptcy Judge

Before the Court is the Motion for
Hardship Discharge ("*Motion*") filed on
behalf of Willie Shorter, a deceased Chapter 13 Debtor (the "Debtor"). TruService
Community Federal Credit Union ("Credit
Union"), a creditor in the case, objected to
the *Motion* and seeks dismissal of the
bankruptcy case. After a hearing on the
merits of the *Motion* on May 28, 2015, the
Court took the matter under advisement.
For the reasons stated below, the Court
finds that the Debtor is entitled to a hardship discharge and, upon appropriate
waiver of the financial management course
requirement, such discharge should be entered.

In its objection, trial and post-trial
briefs, and argument before the Court, the
Credit Union raised four issues: Whether
the Debtor's attorney and/or the Debtor's
wife have standing to bring the *Motion* on
behalf of a deceased person, whether the
*Motion* complies with the standards established by Federal Rule of Bankruptcy Procedure 1016, whether the Debtor satisfies
the hardship discharge requirements set
forth in 11 U.S.C. § 1328(b), and whether
failure to complete a financial management
course is an impediment to granting a
hardship discharge. In his post-trial brief,
the Debtor's attorney responded to the
Credit Union's arguments. The Court will
address each issue below.

### I. JURISDICTION

The Court has jurisdiction pursuant to
28 U.S.C. § 1334 and 157(b)(2)(A), (J), and
(O). The following are the Court's findings of fact and conclusions of law made in
accordance with Federal Rules of Bankruptcy Procedure 9014 and 7052.

### II. BACKGROUND

The Debtor filed his voluntary petition
for relief under the provisions of Chapter
13 of the United States Bankruptcy Code
on July 12, 2010, and his first plan payment was due in August of 2010. (Tr. at
12, 20). The Debtor's wife, Thelma Shorter, did not file for bankruptcy as a joint
debtor. (Tr. at 33). An order confirming
the Debtor's Chapter 13 plan was entered
on the Court's docket on October 18, 2010.
(Tr. at 12). The duration of the original
plan was sixty months. (Tr. at 12). The
original plan provided for payment of attorney fees, administrative expenses, secured claims consisting of two motor vehicle claims, tax claims to the IRS and the
State of Arkansas, and general unsecured
claims. (Tr. at 12–13). All claimants, including the unsecured creditors, were to
receive a 100% distribution through the
plan. (Tr. at 13).

The plan was modified in September and
December of 2010 and five times in 2011.[1]
(Tr. at 12; Doc. Nos. 18, 31, 37, 44, 53, 59,
& 68). The last modification was confirmed on October 26, 2011. During the
course of the modifications, the Debtor
amended his plan and schedules to include
payment of a secured debt to Wyndham
Resorts for a time-share unit. (Debtor's
Ex. 2, Am. Schedule D). In the course of
modifying his plan, the Debtor increased
his plan payment to $2843.00. (Tr. at 12).
That sum remained the plan payment for
the remainder of the case.

The Debtor died on January 25, 2015,
while the case was still pending. (Tr. at

---

1. Pursuant to the Credit Union's request at
trial, the Court takes judicial notice of the
Court's file in the bankruptcy case with regard to undisputed matters including the filings of the Debtor's original plan and the
modifications to the confirmed plan. (Tr. at
42). FED. R. EVID. 201(b).

32). His death occurred between six and seven months prior to plan completion.

Patt Pine, staff attorney for Joyce Babin, Chapter 13 Trustee, testified regarding the Debtor's petition and schedules filed in the case. According to Pine, Schedules B, C, and amended D reflected that all personal property owned by the Debtor was either fully encumbered by liens or exempted under Section 522 of the Bankruptcy Code. (Debtor's Exs. 1, 2). All secured claims were equal to the value of the collateral; consequently, the Debtor owned no equity in the property securing the claims. (Tr. at 27; Debtor's Ex. 2).

Pine explained that this circumstance was important in the Trustee's plan analysis at the beginning of the case. When a Chapter 13 plan is proposed, the Trustee routinely examines it to determine, among other issues, whether the plan satisfies Section 1325(a)(4) of the Bankruptcy Code, which requires that the unsecured creditors in the Chapter 13 case receive as much as they would have received in a Chapter 7 liquidation case. (Tr. at 21, 28). This requirement is frequently referred to as "the best interests of creditors test." (Tr. at 28). The Debtor's plan satisfied this requirement because, as reflected in his schedules, the Debtor owned no unencumbered, nonexempt property to liquidate had he filed a Chapter 7 case. (Tr. at 14). Consequently, any plan payment to unsecured creditors would exceed the amount they would have received in a Chapter 7 case.

Pine testified that the Debtor was required to pay a 100% distribution because of the means test analysis, not the best interests of creditors test. (Tr. at 28). The Debtor's monthly income consisted of $3068.00 in Veteran's Administration benefits and $1900.00 in civil service retirement payments. (Tr. at 31). According to Pine, the Debtor's income resulted in means test and disposable income calculations that exceeded the amount of the proposed plan payment, a circumstance that would only be permitted if the Debtor paid 100% of the claims in the case. (Tr. at 28). Pine stated that the initial plan proposed a 100% distribution and had it done otherwise or if the plan had ever been amended to pay unsecured claims pro rata, the Trustee would have objected. (Tr. at 28–29).

In January of 2015, at the time of death, the attorney fees, secured claims, and tax claims had been paid in full and the unsecured creditors were receiving the full monthly plan payment, less the Trustee's administrative fee. (Tr. at 13–14, 20). General unsecured creditors had received a total of $16,252.18, or 47.28% of the total owed. (Tr. at 13). Pine said $18,124.07 remains owing to the unsecured creditors. (Tr. at 20).

According to Pine, as of January 2015, the Debtor had paid a total of $134,587.00 into the plan. (Tr. at 13). At that time, the Debtor had missed eight payments over the life of the plan, but had made two double payments to partially compensate for an arrearage of $17,397.00. (Tr. at 16–17). However, Pine stated that over the fifty-three months that the case was pending before death, the Debtor had made the vast majority of his payments. (Tr. at 25). He also testified that to complete the plan the Debtor would need to pay only "$18,124.07, plus the Trustee fee, which is less than six percent . . . . [s]o, he would have . . . about 20,000 dollars to pay, maybe a little less" to complete the plan. (Tr. at 20).

Pine stated the Trustee had filed a motion to dismiss the case on March 25, 2015, because the case would not be completed in sixty months. (Tr. at 16). The motion was later withdrawn after the Debtor's attorney filed the instant *Motion*. (Doc.

No. 94, Order Withdrawing Trustee Motion to Dismiss). The Trustee did not object or respond to the Debtor's *Motion*. (Tr. at 17).

Pine testified that to complete the plan in sixty months, each monthly payment would have to be increased by approximately $2200.00 for the months of May through August. (Tr. at 19). This increase would result in the Debtor paying an additional $20,172.00 into the plan in the last four months of the plan, which is consistent with Pine's testimony that approximately $20,000.00 was left to complete the plan.[2] (Tr. at 20).

Mrs. Shorter, an elementary school teacher, testified that her husband of thirty-one years was solely responsible for his Chapter 13 plan payments but that this resulted in her having to assume "the rest of the [financial] responsibility." (Tr. at 31–32). After his death, she has become eligible for survivor's benefits of $1752.00 from the Veterans Administration and civil service retirement. (Tr. at 32). Despite the benefits and her wages, Mrs. Shorter stated that she would suffer a financial hardship if she attempted to assume her husband's plan payments on her limited income. (Tr. at 32).

After her husband's death, Mrs. Shorter visited the Credit Union to withdraw funds and close an account in the Debtor's name. However, a Credit Union employee declined Mrs. Shorter's request, citing "issues" with the account. (Tr. at 34).

When questioned by the Court, Mrs. Shorter clarified earlier testimony that she

intended to use the Credit Union funds for purposes she thought proper. She testified that she had intended to use the money from the account to pay the Debtor's funeral expenses. (Tr. at 35).

She also testified that after consultation with the Debtor's attorney, she decided that a hardship discharge for the Debtor was the best course of action. (Tr. at 33). In response to cross examination, she testified that she had not taken steps to open a probate estate for the Debtor. (Tr. at 33).

Carol St. John, administrative manager at the Credit Union, testified that $4200.77 remained in the account at the time of the Debtor's death, and that the sources of the funds were deposits from the Veterans Administration and civil service retirement on December 31, 2014, and January 2, 2015. She stated that $2870.06 remains unpaid on the Debtor's obligation to the Credit Union. (Tr. at 37–38). The Credit Union has received payment of $2573.64 on its original claim of $5443.70. (Tr. at 20).

## III. ARGUMENTS AND DISCUSSION

### A. *Lack of Standing*

The Credit Union first argues that counsel for a deceased debtor has no standing to file a motion for hardship discharge on the deceased debtor's behalf because the deceased debtor's attorney has a nonexistent client and/or a deceased person has no need for the discharge and fresh start.[3] In his closing argument at

2. If the Debtor had instead made the current plan payment for the months of January through July 2015 he would have paid $19,901.00.

3. Another argument related to the standing issue was raised by the Credit Union in its pre-trial brief. (Doc. No. 99 at 2). It related to the use of the Debtor's signature allegedly

affixed to two documents filed in the case after the Debtor's death. The Credit Union did not introduce those documents as exhibits at the hearing, nor was there any testimony or argument related to them at trial or in the post-trial brief. Because the Credit Union provided no evidence or further argument on this issue, the Court assumes it has been abandoned by the Credit Union. However, in

the hearing, counsel for the Credit Union also contended that if the surviving, non-debtor spouse had appeared in the case as the representative of the Debtor's probate estate, she would have had standing to authorize the *Motion,* but she may not do so as an "heir" without "an official capacity." (Tr. at 47).

Counsel for the Debtor asserts that Federal Rule of Bankruptcy Procedure 1016 (Death or Incompetency of the Debtor) and Section 1328(b) (Chapter 13 hardship discharge), which are the applicable rule and statute, do not expressly prohibit the filing of a motion for hardship discharge by a deceased debtor. Because there is no express prohibition, counsel concludes that an attorney for a deceased debtor may pursue a hardship discharge.

For the following reasons based on the applicable statute, rule and case law, the Court finds that Mrs. Shorter has standing to authorize the *Motion* on the Debtor's behalf.

■ The Court begins by recognizing the "long-standing general principle that the death of the debtor does not abate a bankruptcy proceeding." *In re Perkins,* 381 B.R. 530, 533 (Bankr.S.D.Ill.2007). The court in *Perkins* traced the evolution of this principle from its source in Section 8 of the Bankruptcy Act of 1898, which provided, "The death or insanity of a bankrupt shall not abate the proceedings but the same shall be conducted and concluded in the same manner, so far as possible, as though he had not died...." *Id.* (quoting Bankruptcy Act of 1898 § 8 (repealed 1978)). Regarding this statute the United States Supreme Court has stated that the provision "makes no exception or qualification; after the proceedings have been com-

menced they are not to be abated by death." *Hull v. Dicks,* 235 U.S. 584, 588, 35 S.Ct. 152, 59 L.Ed. 372 (1915).

The current Bankruptcy Code, adopted in 1978, eliminated Section 8 of the Act, although remnants of its language and substance survive in Rule 1016. The Legislative History related to the Bankruptcy Code's provision on property of the estate, 11 U.S.C. § 541, explains why Section 8 was deleted from the Code:

> Once the [bankruptcy] estate is created, no interests in property of the estate remain in the debtor. Consequently, if the debtor dies during the case, only property exempted from property of the estate or acquired by the debtor after the commencement of the case and not included as property of the estate will be available to the representative of the debtor's probate estate. The bankruptcy proceeding will continue *in rem* with respect to property of the [e]state, and the discharge will apply in personam to relieve the debtor, and thus his probate representative, of liability for dischargeable debts.

*In re Perkins,* 381 B.R. at 534 (alteration in original) (quoting H.R. REP. No. 95–595, at 367–68 (1977); S. REP. No. 95–989, at 82–3 (1978)). This explanation demonstrates that a Chapter 7 bankruptcy case is intended to proceed to conclusion despite the death of the debtor. And, contrary to the Credit Union's argument, it shows Congressional intent that a deceased debtor without need of a fresh start may nevertheless receive a discharge posthumously.

The House and Senate Reports fail to address how to proceed in a Chapter 13 case where property of the estate re-vests in the debtor, who then provides for his

---

the event these documents warrant consideration, the Court's analysis of the standing issue generally addresses Debtor's counsel's

authority to further administer the case after the death of the Debtor.

creditors with payments from regular income rather than liquidation of assets. To answer that question, the court in *Perkins* concluded that Rule 1016 "fills an apparent gap in the Bankruptcy Code by identifying the standards to be applied in determining whether to dismiss or proceed with a case under Chapters 11, 12, or 13." *Id.* at 535 (citing *Hawkins v. Eads (In re Eads)*, 135 B.R. 380, 383 (Bankr.E.D.Cal.1991)).

Rule 1016 provides that the Chapter 11, 12, or 13 case may either be dismissed or further administered. FED. R. BANKR. P. 1016. Further administration hinges on the Rule's two standards: whether such administration is possible and whether it is in the best interest of the parties. *In re Eads*, 135 B.R. at 383. But in any event, the decision to dismiss or administer the case requires that "*someone ... do something* when a debtor in a case under chapter 11, 12, or 13 dies." *Id.* (emphasis added); *see also In re Inyard*, 532 B.R. 364, 368 (Bankr.D.Kan.2015) ("certainly, *some party must act* on the Debtor's behalf, if the case is to continue as permitted by Rule 1016") (emphasis added); *In re Kosinski*, No. 10–bk–28949, 2015 WL 1177691, at *3 (Bankr.N.D.Ill. Mar. 5, 2015) (a case can only continue "if *someone is permitted to act* in the bankruptcy case on behalf [of] the deceased debtor. If no party could ever act on behalf of a deceased debtor ... the provisions in Rule 1016 allowing a case to continue after the debtor's death would be meaningless.") (emphasis added).

■ The Court concludes that Rule 1016, legislative history and intent, and case law authorize or give standing to "someone" to pursue further administration of the Chapter 13 case of a deceased debtor if it is possible and in the best interest of the parties. Nevertheless, the Credit Union questions whether Mrs. Shorter is the proper person entitled to act on the Debtor's behalf because she is not a representative of the Debtor's probate estate and lacks official capacity.

Courts have addressed the issue of who may act on behalf of the deceased debtor under Rule 1016 in various ways. Some courts require a state-appointed personal representative to act on the debtor's behalf. *See, e.g., In re Hamilton*, 274 B.R. 266 (Bankr.W.D.Tex.2001) (Chapter 7); *In re Lucio*, 251 B.R. 705 (Bankr.W.D.Tex. 2000) (Chapter 7); *In re Stewart*, No. 01–66434–FRA13, 2004 WL 3310532, at *2 (Bankr.D.Or. Mar. 2, 2004) (permitting further administration of the Chapter 13 case if a personal representative was appointed by state court to fulfill all the duties of the deceased debtor)).

■ Other courts determine who may act on behalf of the debtor on a case-by-case basis. *In re Levy*, No. 11–60130, 2014 WL 1323165, at *4 (Bankr.N.D.Ohio Mar. 31, 2014) (finding that filing end of case documents could be accomplished by a person with a specific knowledge of the deceased debtor's finances). While a probate representative "may most often be the appropriate party to perform the debtor's duties, many estates are never probated and, in other instances, some different party may have a greater interest in ensuring that the bankruptcy case goes forward." *In re Vetter*, No. 11–03988, 2012 WL 1597378, at *2 n. 2 (Bankr.D.S.C. May 7, 2012).

The Credit Union contends that a personal representative should have been appointed before Mrs. Shorter was permitted to act under Rule 1016. The Court, however, declines to apply a hard and fast rule that a personal representative of a probate estate or some other a person previously designated by court appointment is the only person who may have standing to pursue further administration under Rule 1016. The Rule itself imposes no such

restriction, and there is no local rule in place to provide for such a requirement. For the Court to now fashion such a requirement and retroactively apply it to this case would be unfair.

The better approach is to decide who may act on a case-by-case basis. In the instant case, the evidence adduced at the hearing was that Mrs. Shorter was the Debtor's wife of thirty-one years and would be characterized as a spouse and "interested person" [4] under the Arkansas Probate Code. She is eligible to receive a reduced benefit from her husband's pensions. She was not a joint debtor in the case but shouldered the financial responsibilities of the couple with her teacher's salary, freeing the Debtor to make substantial plan payments to his creditors. The Court infers from her testimony that either she or the Debtor is responsible for the Debtor's funeral expenses and that she has earmarked the funds in the Credit Union account for that purpose.

These facts prove Mrs. Shorter directly enabled her husband to comply with his Chapter 13 obligations, facilitated the consummation of the Debtor's plan while he was alive, was and is well acquainted with his financial affairs, and has become the party assuming authority over his affairs after his death. She has not opened a probate estate, but as the court in *Vetter* pointed out, many estates are never probated. Mrs. Shorter, rather than the Court, is in the best position to decide if probate is warranted. With no evidence to the contrary, the Court concludes that Mrs. Shorter is the appropriate person under Rule 1016 to make decisions on the Debtor's behalf and has standing to do so. Contrary to the Credit Union's argument that the Debtor's attorney took it upon himself to file the *Motion*, the evidence was that the Debtor's attorney consulted with Mrs. Shorter and has been duly authorized by her to pursue a hardship discharge for the Debtor.

## B. *Further Administration Under Rule 1016*

■ The Credit Union next argues that Rule 1016 provides for two methods for dealing with the Chapter 13 case of a deceased debtor: either dismissal or further administration if possible and in the best interests of the parties. The Credit Union interprets "further administration" to include continued payments to creditors under the plan and to exclude the award of a hardship discharge to a deceased debtor because Rule 1016 requires the case to "proceed and be concluded" as though the debtor had not died. Because the Debtor's spouse seeks a hardship discharge without further payments, the Credit Union concludes that further administration as though the debtor had not died is not possible and dismissal of the case is warranted.

The majority view is that the grant of a hardship discharge under Section 1328(b) is an acceptable way to further administer a case under Rule 1016. *In re Inyard*, 532 B.R. at 369 (citing *In re Kosinski*, 2015 WL 1177691, at *2; *In re Lizzi*, No. 09–10097, 2015 WL 1576513, at *4 (Bankr. N.D.N.Y. Apr. 3, 2015)); *see also In re Hoover*, No. 09–71464, 2015 WL 1407241, at *2 (Bankr.N.D.Cal. Mar. 24, 2015). Some courts have concluded that a hardship discharge is not only available but sometimes the only alternative for Chapter 13 cases to proceed under Rule 1016. *In re Kosinski*, 2015 WL 1177691, at *2 (cit-

---

4. A spouse is an "interested person" under Arkansas' Probate Code related to decedents' estates, and is distinguishable from an heir.

ARK. CODE. ANN. § 28–1–102(a)(10) & (11) (2011).

ing *In re Bevelot*, No. 05–36051, 2007 WL 4191926, at *1 (Bankr.S.D.Ill. Nov. 21, 2007); *In re Cummins*, 266 B.R. 852, 855 (Bankr.N.D.Iowa 2001); *In re Graham*, 63 B.R. 95, 96 (Bankr.E.D.Pa.1986); *In re Bond*, 36 B.R. 49, 51 (Bankr.E.D.N.C. 1984)). *But see In re Miller*, 526 B.R. 857, 861 (D.Colo.2014) ("A hardship discharge based on the death of the debtor does not satisfy the requirements of Rule 1016."); *In re Hennessy*, No. 11–13793, 2013 WL 3939886, at *2 (Bankr.N.D.Cal. July 29, 2013) (citing *In re Shepherd*, 490 B.R. 338, 341–43 (Bankr.N.D.Ind.2013)) (deceased debtor has no need of a fresh start; his creditors should be paid through the probate process).

By the express language of Rule 1016, granting a hardship discharge to a deceased debtor complies with the Rule's requirement that the case "proceed and be concluded … as though the death … had not occurred." FED. R. BANKR. P. 1016. A discharge is "the normal conclusion to a Chapter 13 case." *In re Lizzi*, 2015 WL 1576513, at *4 (citing *In re Perkins*, 381 B.R. at 532; *In re Fuller*, No. 05–18831, 2010 WL 1463150 (Bankr.D.Colo. Mar. 11, 2010)). Consequently, further administration includes a hardship discharge "because if the death had not occurred, the case could proceed to two possible conclusions: (1) the debtor could have received their [sic] discharge by making the required plan payments, or (2) the debtor could have been granted a hardship discharge." *Id.* at *4 (citing *In re RedWine*, No. 09–84032–JB, 2011 WL 1116783, at *1 (Bankr.N.D.Ga. Mar. 8, 2011); *In re Bevelot*, 2007 WL 4191926).

In the instant case, Mrs. Shorter testified that she was unable to continue making monthly plan payments of $2843.00 without suffering financial hardship, and there was no evidence to the contrary. If the Debtor had been able to make the remaining seven payments of $2843.00 per month from January through July 2015, he would have paid $19,901.00, an amount more than sufficient to pay the balance of the unsecured claims remaining and the trustee's fees, even without paying $17,397.00 arrearage amount. Therefore, the Debtor was on track to complete the plan and receive a discharge. Due to the Debtor's death, the Debtor's pension benefits of $4968.00 a month have been replaced by a smaller survivor's benefit of $1752.00 per month. Mrs. Shorter, an elementary school teacher, is not a highly paid professional. These facts support the Court's conclusion that in this case a hardship discharge is the only possible means of further administering the case so that it can be concluded as though the death of the debtor had not occurred, as required by Rule 1016.

## C. Best Interest of the Parties

■ The Credit Union argues that granting the Debtor a discharge would violate Rule 1016 because the hardship discharge would not be in the best interest of any of the parties in the bankruptcy case. (Doc. No. 104, Credit Union Post–Trial Brief at 3). It asserts that if the Court dismisses the case, as Rule 1016 permits, the creditors in the case may pursue their prepetition claims through probate proceedings. On the other hand, granting a discharge would preclude creditors in the case from further collection of their partially paid claims. *Id.* The Credit Union argues that it would significantly benefit from a dismissal, which would permit the Credit Union to set off the Debtor's $2870.06 debt against the $4200.77 balance in the Debtor's account under state law.[5] (Doc. No. 99, Credit Union Trial Brief at 7).

---

**5.** Although the Credit Union makes this argument and presented testimony in support of

The Credit Union further contends that in addition to placing the creditors at a disadvantage, a hardship discharge would be of no benefit to the Debtor, who is no longer in need of a fresh start. (Doc. No. 104, Credit Union Post–Trial Brief at 3). The Credit Union then argues that a discharge would result in a "windfall" to the nonparty surviving spouse because all unsecured claims in the bankruptcy case would be discharged and the only remaining claims against the deceased Debtor's property would be post-petition claims not provided for in the Debtor's plan, if such claims exist. *Id.* Thus, the Credit Union urges the Court to consider only whether the best interests of the creditors in the case are served because the Debtor will not benefit from a fresh start and the surviving spouse is not a party eligible for consideration under Rule 1016.

Courts are divided on the question of which parties must benefit from further administration under Rule 1016. Depending on the facts of the case, many courts consider the interests of all who are affected by a hardship discharge, and not just the parties to the bankruptcy case, i.e., the Debtor, the Creditors, and the Trustee. *See, e.g., In re Inyard,* 532 B.R. at 371–72 (weighing the relative benefits to pre-petition and post-petition creditors, the trustee, and the deceased debtor); *In re Conn,* No. 13–62278, 2015 WL 3777958, at *2–3 (Bankr.N.D.Ohio June 12, 2015) (considering benefits to creditors and surviving spouse); *In re Lizzi,* 2015 WL 1576513, at *5–6 (discussing the interests of all creditors, the deceased debtors, and public policy); *In re Hoover,* 2015 WL 1407241, at *3

(permitting hardship discharge where benefit would inure to estranged but non-divorced spouse and there was no evidence of probate proceeding that would provide recourse for unpaid, unsecured, prepetition claimants); *In re Bond,* 36 B.R. at 51–52 (considering deceased debtor and the debtor's minor children).

A narrower view of the best-interests-of-the-parties criterion in Rule 1016 is expressed in three cases cited by the Credit Union: *In re Sales, In re Hennessy,* and *In re Miller.* In each case, the court denied a hardship discharge to a deceased Chapter 13 debtor based on the interests of the parties in the case. Each case is distinguishable on its facts from the instant case.

In *Sales,* the Court reasoned that further administration of the case would prejudice the creditors who could not subsequently pursue their claims after bankruptcy and it would not benefit the debtor's estate. Significantly, in *Sales* the court stated that the debtor had not made sufficient payments "to cure the mortgage and the mortgage remains in default." *In re Sales,* 2006 WL 2668465, at *3 (Bkrtcy. N.D.Ohio Sept. 15, 2015).[6] The only person to benefit was the debtor's estranged spouse, who was not a party. *Id.* These facts differ from the instant case, where all secured creditors have been paid in full and there is substantial benefit to both the Debtor and his spouse, whose earnings were essential to the success of the plan.

In *Hennessy,* the debtor proposed a 100% distribution to unsecured creditors

---

this argument, the Court has insufficient evidence to make a determination as to whether the Credit Union would have a right of setoff if the case were dismissed.

**6.** The Court is citing *Sales* only because it was relied on by the Credit Union; however, it

should be noted that the court in *Sales* indicated at the beginning of the opinion, in capital letters, that the "opinion is not intended for publication or citation." *Sales,* 2006 WL 2668465, at *1.

and avoided three judgment liens on her home early in the case. When she died about eighteen months into the case, her unsecured creditors had received no distribution. The bankruptcy court ruled that further administration through hardship discharge was detrimental to creditors, of no benefit to the debtor, and only benefitted the debtor's heirs who were not parties to the case. *In re Hennessy,* 2013 WL 3939886, at *1–2. The facts in *Hennessy* are not comparable to those in the instant case, where the Debtor owned no real property encumbered by judgment liens that could be avoided, the unsecured creditors have been paid 47% of their claims, the surviving spouse's income was essential to the success of the plan, and the Debtor lacked only seven months to complete the plan.

In *Miller,* the district court upheld the bankruptcy court's order dismissing the deceased debtor's Chapter 13 case instead of granting a hardship discharge. This case involved a lien on the primary residence of the Debtor that he occupied with his wife. The wife was not an obligor on the loan and was not a debtor in the bankruptcy case. The facts also indicated the debtor was only three years into a five-year plan. *In re Miller,* 526 B.R. at 859–60. The court reasoned that a hardship discharge is not contemplated under Rule 1016, and, additionally, there was no showing that the best interests of the parties would be served because the only beneficiary of the discharge would be the debtor's wife, a nonparty. *Id.* at 861–62. The Court respectfully disagrees with the conclusion that a hardship discharge is not contemplated by the Rule, as discussed more fully in Part B, above. The facts in *Miller* are also distinguishable from the facts in the instant case in that the Debtor here had only seven months to complete his plan, no liens on real property were at issue, and the surviving nonparty spouse in the instant case enabled the Debtor to make substantial plan payments.

In the case before this Court, despite notice of the *Motion* and an opportunity for a hearing afforded to all parties to the bankruptcy proceeding, only the Credit Union filed an objection. Prepetition secured creditors and priority creditors in the case have been paid in full and a discharge would not impact them in any way. Pine testified that the Chapter 13 Trustee, who is charged with protecting the interests of the creditors in the case, had no objection to the granting of a hardship discharge. Therefore, the Trustee and all creditors except the Credit Union have waived any argument to contest the hardship discharge, including whether their interests are being served. *See In re Ferguson,* No. 11–50950–CAG, 2015 WL 4131596, at *2 (Bankr.W.D.Tex. Feb. 24, 2015) (asserting that since neither the Trustee nor the creditors raised an argument as to the best interests of the parties, the arguments are waived).

The Credit Union contends that the Debtor has no interest in the proceedings because he is deceased and that Mrs. Shorter is not a party. Under that rationale, the determination of whether to further administer the case hinges on the best interest of only one party, the Credit Union. The Court declines to take such a narrow view in light of the particular circumstances of this case and will instead consider whether further administration is in the best interest of the Credit Union, the Debtor, and Mrs. Shorter. Case law, legislative history, Section 1328(b), and Rule 1016 support the finding that a deceased debtor is still a party to an open and ongoing bankruptcy. Mrs. Shorter, although not the named movant in the *Motion,* is the person who caused the *Motion* to come before the Court on behalf of her husband, is his surviving spouse, and is

therefore entitled to have her interests considered. Furthermore, her contributions to the family household enabled her husband to fulfill his plan obligations when he was alive, and consequently, she has a personal and financial stake in seeing that her husband's discharge is granted.

Assuming without deciding that a dismissal of the case would result in the Credit Union's collection of the remaining $2870.06 claim, the Court must nevertheless find that such benefit is outweighed by the benefit to the Debtor that would result from a discharge of $18,124.07 in remaining pre-petition debt. The discharge would increase the likelihood that probate would not be necessary and the entire amount in the Credit Union account may be available for the Debtor's funeral expenses, as Mrs. Shorter proposes. The Court can think of no post-death circumstance that more directly confers a benefit on a deceased person. Therefore, the Court finds that a discharge enabling the Debtor to pay his own funeral expenses benefits the Debtor to a greater extent than the benefit to the Credit Union of dismissal so that it can collect some or all of its $2870.06 claim.

Another factor to be considered in this analysis is the fact that the Credit Union has already received 47%, or $2573.64 of its total claim, almost half the distribution originally proposed by the plan. Dismissing the case might provide the Credit Union a larger distribution on its claim, but it would also result in the Debtor not receiving his discharge despite his fifty-three months in Chapter 13 during which he paid $134,587.00 in total dividends. Even though the Debtor missed several payments over the life of the plan, the evidence was that only $18,124.07 in general unsecured claims remained unpaid. Had he lived and made the seven payments remaining in his plan at the current plan

payment amount of $2843.00, he would have paid in an additional $19,901.00 by the last payment in July. Although Pine testified as to an "arrearage" of $17,397.00, he further testified that a total of only about $20,000.00 remained to be paid overall. In other words, the Debtor would not have had to pay the arrearage *and* the $18,124.07 to complete the plan but only the amount necessary to pay the remaining creditors plus the trustee's fee, which Pine testified totaled approximately $20,000.00.

The Credit Union has stipulated the Debtor's death was a circumstance for which the Debtor should not be held accountable (Tr. at 11); therefore, dismissal would unfairly penalize the Debtor for dying. *See In re Inyard,* 532 B.R. at 372 (declining to penalize the debtor because he died and considering his interests under Rule 1016 to determine a hardship discharge was warranted).

As to Mrs. Shorter, she has a personal and a financial stake in seeing that her husband's funeral expenses are paid, and a discharge of $18,124.07 in unsecured claims against his estate will aid in accomplishing that goal. The Credit Union argues that a hardship discharge will result in a windfall to Mrs. Shorter, who is a "stranger to the case." The Court has already found that she can be considered a party because of the specific facts in the case. But even if she were not entitled to consideration under Rule 1016, the Credit Union has not identified what windfall Mrs. Shorter will receive. The Court does not consider access to the funds needed to pay her husband's funeral expenses to be a windfall. *See In re Perkins,* 381 B.R. at 532 (objecting trustee had not shown that there was a fully solvent probate estate and that the Debtor's estate would receive a windfall so that the bankruptcy court could find it was in the best interests of

the parties to "send them off to state court").

Weighing the interests of these three parties, the Court determines that the greatest benefit will result from granting a hardship discharge as opposed to dismissing the case. The Court concludes that pursuant to Rule 1016, further administration is possible and in the best interest of the parties.

### D. *Entitlement to Hardship Discharge*

■ Having found compliance with Rule 1016, the Court next examines the issue of whether the Debtor is entitled to a hardship discharge under the statute. Section 1328 of the Bankruptcy Code provides for two types of discharges. The first is available to the Chapter 13 debtor who has fully complied with his proposed plan while the second, the hardship discharge, is selectively afforded to a debtor who is unable to complete his plan. 8 COLLIER ON BANKRUPTCY § 1328.01 (Alan N. Resnick & Henry J. Sommer, et al. eds., 16th ed.). "The full-compliance discharge provided by section 1328(a) . . . is broader than the discharge received in any other chapter of the Code. . . ." *Id.* By contrast, the hardship discharge defined in Sections 1328(b) and (c) is less broad and generally is "coextensive with the discharge received by debtors in other chapters, as it incorporates the exceptions to discharge listed in section 523(a) of the Code." *Id.*

Section 1328(b) of the Bankruptcy Code states that after the confirmation of the plan and after notice and a hearing, the court may grant a discharge to a debtor who has not completed plan payments if the following three conditions are met:

(1) the debtor's failure to complete such payments is due to circumstances for which the debtor should not justly be held accountable;

(2) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 of this title on such date; and

(3) modification of the plan under section 1329 of this title is not practicable.

11 U.S.C. § 1328(b) (2012).

■ In this case, it is undisputed that the Debtor's plan has been confirmed as required by the statute. The Chapter 13 debtor also has the burden of proving that each of the three conditions in Section 1328(b) have been met. *In re Cummins,* 266 B.R. at 855 (citing *In re Nelson,* 135 B.R. 304, 307 (Bankr.N.D.Ill.1991); *In re Schleppi,* 103 B.R. 901, 903 (Bankr. S.D.Ohio 1989)); *In re Lizzi,* 2015 WL 1576513, at *3 (citing *Bandilli v. Boyajian (In re Bandilli),* 231 B.R. 836, 839 (1st Cir. BAP 1999)). "Unsubstantiated and conclusory statements are insufficient." *In re Schleppi,* 103 B.R. at 903 (citing *In re Dark,* 87 B.R. 497, 498 (Bankr.N.D.Ohio 1988)).

The Credit Union has stipulated that the first and third conditions were satisfied in this case (Tr. at 11), but argues that the Debtor failed to prove the second condition. The Credit Union asserts that, other than the Trustee's counsel's conclusory testimony, the Debtor did not adduce evidence that the amount of property actually distributed under the plan was at least equal to the value available for liquidation on the effective date of the plan. (Doc. No. 104, Credit Union Post–Trial Brief at 2).

The order confirming the plan was entered on October 18, 2010, which is the effective date of the plan. *Hamilton v. Lanning,* 560 U.S. 505, 518, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010) (stating the effective

date of the plan is "the date on which the plan is confirmed and becomes binding"). Except for changes in verb tense, the second condition of the hardship discharge in Section 1328(b)(2) is identical to the best interests of creditors test to be met before a Chapter 13 plan may be confirmed. *Compare* 11 U.S.C. § 1325(a)(4) (2012), *with* 11 U.S.C. § 1328(b)(2)(2012). Pine testified that the Trustee's analysis prior to confirmation determined that the best interests of creditors test was satisfied and the plan could be confirmed.

Similar to the best interests of creditors test, the second condition of the hardship discharge "requires that unsecured creditors actually receive no less than they would have received in a Chapter 7 liquidation. . . . Where unsecured creditors would receive no distribution in a Chapter 7 liquidation, any payment to them in a Chapter 13 plan satisfies this requirement." *In re Cummins*, 266 B.R. at 856 (citing *In re White*, 126 B.R. 542, 545 (Bankr.N.D.Ill.1991); *In re Schleppi*, 103 B.R. at 904; *In re Nelson*, 135 B.R. at 308).

The Debtor's evidence that the Section 1328(b)(2) condition is met was adduced through Pine's testimony. Reviewing the Trustee's records in the Debtor's case, Pine stated that prior to the Debtor's death, the unsecured creditors were actually paid $16,252.18, which was 47% of the unsecured claims. (Tr. at 13). Pine identified Exhibits 1 and 2, which were admitted into evidence without objection by the Credit Union and which contained the Debtor's Schedules B, C, and amended D. Pine reviewed the two exhibits and then testified that based on these documents, the Debtor owned no property that was nonexempt and/or unencumbered by liens on the effective date of the plan. (Tr. at 14–15).

The Court finds Pine was a credible, knowledgeable witness, and, to the extent he drew some conclusions, they were substantiated by documentary evidence. Much of his testimony related to Section 1328(b)(2) was based on his review of the property values and ownership interests supplied by the Debtor in his schedules submitted under penalty of perjury and by the Trustee's own records regarding case analysis and plan payment history. Moreover, the Court can independently evaluate the exhibits relied on and draw its own conclusions.

On cross examination by the Credit Union, Pine conceded he had no knowledge of "extraneous factors" regarding resources that might not have been revealed in the schedules and the Trustee's records or that might exist now, as opposed to when the best interests of creditors test was applied at the beginning of the case. (Tr. at 21–22). The Credit Union's attorney did not inquire about specific property, nor did he ask this question of Mrs. Shorter. The record contains no evidence of other resources available for liquidation on the effective date of the plan, much less the liquidation value of those resources as compared to the $16,252.18 sum actually paid to unsecured creditors through plan payments.

▇ If the Credit Union is implying that the Debtor has acquired property that could now be liquidated, the implication is irrelevant to a determination of whether the Debtor has satisfied the second condition. As the Court understands Section 1328(b)(2), the condition refers to the effective date of the plan as the point in time when a determination is made as to the liquidation value of the Debtor's assets. Any increase or diminution in liquidation value after the effective date of the plan, October 18, 2010, would have no bearing on the Court's determination under Sec-

tion 1328(b)(2). The Credit Union presented no evidence that the Debtor now owns additional nonexempt, unencumbered assets, but even if such property exists, it would not be relevant for the liquidation analysis applicable to this case.

The Court finds that the Debtor fulfilled the second condition of Section 1328(b). The schedules admitted into evidence as exhibits and the Trustee's records testified to by Pine proved that on the effective date of the plan, the Debtor owned only exempt or fully encumbered property. Thus, there would have been nothing to liquidate and pay to unsecured creditors in a Chapter 7 case. On the other hand, unsecured creditors were actually paid 47% of their claims from the Debtor's pension income, which is a sum greater than the zero liquidation value of the Debtor's assets on the effective date of the plan. Therefore, the three conditions provided for by Section 1328(b) are met.

E.   *Compliance with Section 1328(g)*

█ The Credit Union also argues that the Debtor is prohibited from receiving a discharge because he has not complied with Section 1328(g) of the Bankruptcy Code. That section provides that a court may not grant a discharge under Section 1328 unless, after filing the petition, the debtor completes "an instructional course concerning personal financial management. . . ." 11 U.S.C. § 1328(g)(1) (2012). The Credit Union points out that the proper form indicating compliance has not been filed, and, therefore, the Debtor may not be granted a discharge.

The Debtor's attorney contends that the Bankruptcy Code provides an exception to the financial management course requirement to "a person described in section 109(h)(4)." (Doc. No. 105, Debtor's Post–Trial Brief at 5–6; 11 U.S.C. § 1328(g)(2) (2012). A person described in Section

109(h)(4) is a "debtor whom the court determines, after notice and hearing, is unable to complete those requirements because of incapacity, disability, or active military duty." 11 U.S.C. § 109(h)(4) (2012). The statute defines "disability" for purposes of Section 109(h)(4) to mean "that the debtor is so physically impaired as to be unable, after reasonable effort, to participate in an in person, telephone, or Internet briefing required under paragraph (1)." 11 U.S.C. § 109(h)(4) (2012).

In ruling on whether a deceased Chapter 13 debtor is exempt from the taking the instructional course and thus eligible for a Section 1328 discharge, many courts determine that the debtor suffers from either disability or incapacity that renders the debtor's participation both "meaningless and impossible." *In re Lizzi,* 2015 WL 1576513, at *7 (holding that deceased debtor was suffering from a disability under Section 109(h)(4) and would be excepted from financial management requirement); *see also In re Fogel,* No. 14–cv–01851–PAB, —— B.R. ——, ——, 2015 WL 5032055, at *4 (D.Colo. Aug. 26, 2015) (citations omitted) (finding that the death of the debtor constitutes "incapacity" for purposes of Section 109(h)(4)); *In re Inyard,* 532 B.R. at 373 (waiving financial management course under the Section 109(h)(4) exception); *In re Bouton,* No. 10–40989–EJC, 2013 WL 5536212, at *2 (Bankr. S.D.Ga. Oct. 7, 2013) (citations omitted) (stating death of the Chapter 13 debtor constituted a disability under 109(h)(4)). *But see White v. Glennville Bank (In re White),* No. 06–60363, 2011 WL 3426166, at *2 n. 3 (Bankr.S.D.Ga. May 16, 2011) (holding deceased debtor did not fit the Section 109(h)(4) exception to the course requirement; death is not listed in the statute).

In agreement with the assessment of death as a condition equivalent to either

disability or incapacity are several Chapter 7 cases. *See, e.g., In re Thomas,* No. 07–00097, 2008 WL 4835911, at *1 (Bankr. D.C. Nov. 6, 2008) (waiving requirement for deceased Chapter 7 debtor to complete financial management course because his death is an incapacity); *In re Henderson,* No. 06–52439–C, 2008 WL 1740529, at *1 (Bankr.W.D.Tex. Apr. 9, 2008) (determining that death is a disability under the definition in Section 109(h)(4)); *In re Robles,* No. 07–30747–C, 2007 WL 4410395, at *2 (Bankr.W.D.Tex. Dec. 13, 2007) (observing that Chapter 7 debtor's death was "the ultimate disability" in terms of debtor's ability to participate in an instructional course on financial management); *In re Trembulak,* 362 B.R. 205, 207 (Bankr. D.N.J.2007) (allowing deceased debtor to be excused from financial management course under section 109(h)(4) because "clearly the Debtor . . . cannot participate" in the course nor would it aid him in the future).

In the instant case, the Debtor is so physically impaired that he cannot participate in or benefit from an instructional course on financial management. The exception to the requirement to participate in such a course clearly applies here. For this reason, the Court will waive the requirement upon proper application to the Court.

### IV. CONCLUSION

For the foregoing reasons, the Court determines that the Debtor is entitled to a hardship discharge under Section 1328(b) and (c) and should be exempt from the financial management course required by Section 1328(g). The Debtor is allowed twenty-one days from the date of this order to apply for the financial management course exemption provided by Section 109(h)(4). In the event the exemption is granted, the clerk is directed to enter a hardship discharge in this case.

IT IS SO ORDERED.